* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford, the additional deposition testimony admitted into the Record of Evidence, and the briefs, arguments, and supplemental briefs before the Full Commission. The appealing party has shown good grounds to reconsider the evidence and reverse the opinion of award. Accordingly, the Full Commission REVERSES the Opinion and Award of Deputy Commissioner Ledford.
 * * * * * * * * * * * *Page 2 
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties through the Pre-trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At the time of the Plaintiff's injury, an employee-employer relationship existed between Plaintiff and Defendant Pitt County Memorial Hospital.
3. Defendant Pitt County Memorial Hospital was self-insured at all times relevant to this claim. Aegis Administrative Services was the servicing agent at all relevant times.
4. The date of Plaintiff's injury by accident was July 27, 2002.
5. Plaintiff's average weekly wage may be determined from an accurate Industrial Commission wage chart, Industrial Commission Form 22, prepared by the Defendant.
6. Defendant admits that Plaintiff reported an on-the-job incident occurring on July 27, 2002, but denies that such incident caused the condition for which Plaintiff sought treatment after August 2003 and eventually underwent surgery with Dr. Davidson on December 5, 2003.
7. The issues for decision include the following:
 a. Whether the back condition for which Plaintiff underwent surgery on December 5, 2003, by Dr. Larry Davidson is casually related to any injury from the July 27, 2002 work incident.
 b. Whether Plaintiff is entitled to payment of past, present, and future medical expenses due to the back condition for which Plaintiff underwent surgery on December 5, 2003. *Page 3 
 c. Whether Plaintiff is entitled to past, present, and future temporary total disability compensation.
 * * * * * * * * * * * EVIDENCE
1. The parties stipulated into evidence before the Deputy Commissioner the following documentary exhibits:
 a. Stipulated Exhibit #1: Industrial Commission Form 22.
 b. Stipulated Exhibit #2: Pitt County Memorial Hospital Occupational Health Encounter Notes from August 12, 2002 — August 18, 2003
 c. Stipulated Exhibit #3: Authorization from servicing agent for a second opinion evaluation with Dr. Bloem
 d. Stipulated Exhibit #4: Medical Treatment Notes from the June 26, 2002, motor vehicle accident
 e. Stipulated Exhibit #5: Bloem Orthopaedic Center, P.A., Dr. J. Th. Bloem Medical Treatment Notes
 f. Stipulated Exhibit #6: Surveillance reports and videotape
 g. Stipulated Exhibit #7: Report from Dr. Max Kasselt of Kasselt Bone and Joint Center.
 h. Stipulated Exhibit #8: Report from Gregory Gridley, Ph.D. *Page 4 
2. The following individual testified at the hearing before the Deputy Commissioner:
 a. Sylvia Perkins
3. The following depositions were received into evidence following the hearing before the Deputy Commissioner:
 a. Larry Davidson, M.D.
 b. Clarence E. Ballenger, III, M.D.
 c. Sherrie Odom, P.T.
 d. Marian Swinker, M.D.
 e. Booker Keyes, M.D.
4. The following additional depositions were received into evidence following the hearing before the Full Commission:
 a. Clarence E. Ballenger, III, M.D. (second deposition)
 b. Larry Davidson, M.D. (second deposition)
 * * * * * * * * * * *
Based upon all of the competent evidence adduced from the record and the reasonable inferences arising therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, Plaintiff was 48 years of age. In July 2002, Plaintiff was employed by Pitt County Memorial Hospital as a Nursing Assistant II, and her job duties in that position included lifting patients. On July 27, 2002, Plaintiff injured her back while helping two other staff members lift a patient from a commode into a wheelchair. *Page 5 
2. On June 26, 2002, a month prior to the work-related incident, Plaintiff was involved in a motor vehicle accident in which a part fell from her car causing it to veer off the road and into a ditch. Although the accident resulted in no visible damage to the car, the car apparently came to an abrupt halt, causing Plaintiff to strike her left knee on the dashboard. Plaintiff complained to the arriving paramedics of lower back and left leg pain, and was accordingly placed in a C-Spine collar and transported on a backboard to the hospital. At the hospital, Plaintiff complained of, and received medical treatment for, left knee pain, left hip pain, and lower back pain.
3. A CT scan of Plaintiff's pelvis performed at that time revealed facet joint arthrosis in the lower lumbar spine and degenerative disc disease at L5-S1. Plaintiff was discharged with Percocet and Flexeril, and instructed to follow up with an orthopedist and to return if symptoms worsened.
5. On June 28, 2002, Plaintiff presented for follow-up treatment with Dennis A. Czuchra, PA-C, complaining of continuing left hip and leg pain only. Mr. Czuchra found that Plaintiff had mild tenderness of the left paralumbar region and mild pain with palpitation of the left hip, and diagnosed her with a resolving contusion of her back and hip. Because plaintiff appeared to be showing an allergic reaction to the Percocet, Plaintiff was prescribed Darvocet in its place.
6. Plaintiff returned to Mr. Czuchra on July 1, 2002, and described herself as 60% better and receiving a lot of help from the Darvocet and Flexeril. Mr. Czuchra found no signs of radicular symptoms and no paraspinal muscle spasm, but did note mild tenderness to palpitation over the spine. Mr. Czuchra again diagnosed plaintiff with a resolving contusion of her back and hip, and approved of Plaintiff's intention to return to work full-duty the next day. *Page 6 
7. According to the Form 22 stipulated to by the parties before the Industrial Commission, Plaintiff did not miss any days of work due to her June 26, 2002, automobile accident.
8. On July 23, 2002, Plaintiff apparently phoned in a request for a refill of her Darvocet pain medication.
9. On July 27, 2002, Plaintiff injured her back while lifting a patient in the course of her regular duties as a nursing assistant. As Plaintiff was helping to lift the patient off of a commode and into a wheelchair, she heard something in her back. At that point, Plaintiff became weak and her legs gave out. Although plaintiff did not feel any particular pain at that time, she filled out an employee event report describing the incident that same day. Plaintiff continued to work the remainder of her shift and did not miss any work at that time as a result of the incident. She did not seek any medical treatment at the time.
10. On August 7, 2002, J. Larkins, R.N., with Defendant's Occupational Health Department called Plaintiff at work to ask her about the July 27, 2002, incident. Plaintiff indicated that, while her low back had been sore for a while, she had taken pain medication that she already had at the time, and was now feeling better with no complaints of pain. Ms. Larkin recorded plaintiff's injury as a lumbar back strain caused by lifting.
11. On August 12, 2002, Plaintiff presented to Defendant's Occupational Health Department and saw Dr. Marian Swinker, a doctor board-certified in Occupational and Environmental Medicine and Family Medicine. Plaintiff reported that her back was "killing her," rating the pain as 10 out of 10, and explained that she had described herself as "pain free" over the phone on August 7, 2002, because she had been taking Darvocet at the time. Dr. Swinker examined Plaintiff and found tenderness in the sacroiliac joint on the left, suggesting *Page 7 
sacral dysfunction, but found no radicular symptoms suggesting a nerve injury. Dr. Swinker placed Plaintiff on light duty work restrictions and referred her to physical therapy to stretch out the muscles that were causing her to carry one hip higher than the other.
12. Plaintiff began physical therapy with Sherrie Odom, P.T., at the Therapeutic Life Center on August 15, 2002. According to Ms. Odom, Plaintiff was generally uncooperative with the physical therapy treatment, at one point even accusing Ms. Odom of confusing her treatment history with that of another patient. Throughout the period of treatment, Plaintiff was consistently very vocal and dramatic in her complaints of low back pain, as well as of pain radiating circumferentially down both legs, and Plaintiff continually reminded Ms. Odom about her pain despite Ms. Odom's continued assurances that she understood that Plaintiff was in pain. Ms. Odom found no objective evidence of a disc injury, and concluded that Plaintiff's complaints of subjective pain were disproportionate to the objective evidence of muscular injury. However, Ms. Odom did not doubt that Plaintiff was indeed experiencing some amount of pain during the period of her physical therapy treatment.
13. On August 19, 2002, Plaintiff returned to Dr. Swinker, complaining of pain in her low back and in both legs. Plaintiff was very pain focused, and Dr. Swinker suspected symptom magnification. On August 26, 2002, Plaintiff returned again to Dr. Swinker complaining of ongoing back and leg pain, as well as bad headaches due to lack of sleep from the continuing pain. Dr. Swinker noted that Plaintiff's original muscle injury had resolved and that Plaintiff's pelvis was level, and concluded that Plaintiff's continuing subjective complaints of pain were out of proportion to the remaining objective findings of tenderness to light touch on both sides of her spine but no tenderness to actual palpitation. Dr. Swinker recommended that Plaintiff undergo a *Page 8 
formal functional capacity evaluation, believing that her "actual impairment is in question" and that "psychogenic pain and anxiety seem prominent."
14. On August 27, 2002, Plaintiff returned to work part-time and on limited duty. On that day, Plaintiff saw Ms. Odom for physical therapy for the last time. At that time, Ms. Odom concluded that active physical therapy was no longer necessary as the objective evidence of muscle strain demonstrated by Plaintiff at the beginning of treatment had resolved, and further physical therapy treatment did not appear likely to resolve Plaintiff's continued subjective complaints of pain. In her August 30, 2002, report to Dr. Swinker, Ms. Odom recommended that Plaintiff's physical therapy treatment be terminated, as the passive treatment options remaining to Plaintiff did not require the supervision of a licensed therapist. Ms. Odom also expressed frustration in her report to Dr. Swinker that she had not been able to transition Plaintiff out of her obvious anger at her situation and into a recovery mode.
15. On August 28, 2002, Plaintiff was seen by Judy Kallweit, N.P., with Defendant's Occupational Health Department, complaining of "burning pain" on both sides of her back with pain down the front and back of both legs when she walked. Once again, Plaintiff was tender to light touch on both sides of L4-5, but showed no increased tone or spasm in her muscles and no apparent limitations on her flexibility.
16. On September 4, 2002, Plaintiff returned once again to Dr. Swinker, who again noted "positive nonphysiologic findings" in her examination of Plaintiff. At the time, Plaintiff was being very dramatic, sighing and gesturing and making exclamations. According to Dr. Swinker, Plaintiff was insistent that Defendant's agents, including Dr. Swinker, thought Plaintiff was crazy. Concerned with the possibility of secondary gain issues underlying Plaintiff's *Page 9 
complaints, Dr. Swinker referred Plaintiff for a second opinion with Dr. Max Kasselt, an orthopedist.
17. On October 10, 2002, Plaintiff presented to Dr. Kasselt for an independent medical evaluation, complaining of low back pain at a level of at least 6 out of 10 and, at its worst, of 8 out of 10. Dr. Kasselt found Plaintiff pleasant, with a cooperative demeanor. Plaintiff was tender to light touch in her lower back, but was able to squat and to straight leg raise in the supine position to 90 degrees, expressing discomfort with grunting noises only at the extremes of her ranges of motion, leading to an assessment by Dr. Kasselt of subjective complaints without objective findings and some symptom amplification behavior. Dr. Kasselt noted radiological evidence of multilevel lumbar degenerative disc disease, but found no evidence of any permanent aggravation of that condition as a result of the July 27, 2002, workplace lifting incident. Dr. Kasselt opined that Plaintiff had reached maximum medical improvement from both the car accident and the work injury, with no permanent physical impairment from either event.
18. Also on October 10, 2002, Plaintiff underwent a psychological evaluation with Gregory Gridley, Ph.D., who administered the MMPI-2 psychological test. The test results indicated a pattern consistent with that of an individual who psychologically views herself as being ill. Based on her presentation before him, Dr. Gridley diagnosed Plaintiff as fitting the psychological criteria for "No Condition," but noted that Plaintiff's presentation as reflected in her treatment records could warrant a diagnosis of "Malingering."
19. On December 2, 2002, Plaintiff underwent a functional capacity evaluation (FCE) at ProActive Therapy, the results of which Dr. Swinker deemed invalid due to nonphysiologic responses to activities and requests and self-limiting behavior in more than a third of the tasks. *Page 10 
The FCE activities were terminated secondary to Plaintiff's multiple complaints of pain in her back and legs and even in non-injured areas such as her arms and shoulders. Plaintiff also complained of chest pain and shortness of breath, although her blood pressure and pulse remained within normal limits.
20. As of December 23, 2002, Dr. Swinker concluded that Plaintiff did not have an acute workers' compensation injury, and that no further medical treatment was indicated arising from the work-related incident. Dr. Swinker found that Plaintiff was at maximum medical improvement without any permanent restrictions related to her workplace injury claim, and that any remaining work restrictions related solely to personal medical conditions such as Plaintiff's high blood pressure. Dr. Swinker explained to Plaintiff at that time that Plaintiff did not have a condition that warranted surgery or an MRI.
21. On April 24, 2003, Plaintiff presented to Dr. Josephus Bloem, an orthopedic surgeon, for a second-opinion evaluation for her ongoing low back pain with occasional pain extending into her legs. Straight leg raises were 90/90, but touching of the back with very light touch caused an enormous reaction. Dr. Bloem recommended an MRI of Plaintiff's lumbosacral spine to "make sure that there is no unexpected pathology."
22. Following a May 8, 2003, MRI, Plaintiff returned to Dr. Bloem on May 12, 2003. According to Dr. Bloem, the MRI was "fairly negative," showing no herniated disc or major pathology aside from evidence of mild lumbar degenerative changes. Based on the MRI, Dr. Bloem concluded that surgical intervention was not warranted. Because most remaining conservative treatment options had been exhausted, Dr. Bloem recommended that Plaintiff undergo a series of epidural steroid injections. *Page 11 
23. On June 27, 2003, Plaintiff returned to Dr. Bloem and reported that the first epidural steroid injection was somewhat helpful. On August 7, 2003, Plaintiff reported that a second epidural steroid injection did not help at all. At that visit, Plaintiff's straight leg raises were still 90/90 and bilateral reflexes remained equal and normal. Dr. Bloem informed Plaintiff that he had no further orthopedic treatment options and released her from his care, referring her to Dr. Ira Hardy for a spine consultation. However, Defendant refused to authorize an appointment with Dr. Hardy under workers' compensation. Defendant did not pay for any more medical treatment after Plaintiff's last visit to Dr. Bloem on August 7, 2003.
24. On August 18, 2003, Plaintiff was brought to Defendant's Occupational Health Department after complaining of leg and back pain while at work. While waiting to be seen, Plaintiff began behaving as though she were having a seizure. Plaintiff's eyes fluttered, her arms were stiff and shaking and she was non-responsive, but she had no loss of bladder or frothing from the mouth. Plaintiff was taken to Defendant's Emergency Department where she was diagnosed with a pseudo-seizure and was seen by a psychiatrist.
25. On her own, Plaintiff presented to Dr. Clarence Ballenger, a neurologist, on October 2, 2003, at which time Plaintiff's straight leg raise test was positive on the left and Plaintiff demonstrated an absent ankle jerk. Dr. Ballenger instructed Plaintiff not to do any heavy lifting or bending, kept her on light work duty, and sent her out to obtain an EMG nerve conduction test.
26. Plaintiff returned to see Dr. Ballenger on October 16, 2003, at which time her straight leg raising tests were very positive. Based on the positive results of the nerve conduction test, Dr. Ballenger recommended that Plaintiff undergo a lumbar myelogram. The October 27, 2003, lumbar myelogram revealed severe spinal stenosis at L4-5. As of October 30, *Page 12 
2003, Dr. Ballenger opined that Plaintiff should not be working and wrote her a note taking her out of work.
27. Plaintiff had continued working light-duty for Defendant until October 29, 2003. As of the date of the hearing before the Deputy Commission, Plaintiff had not returned to work for any employer since October 29, 2003.
28. Following a series of referrals from Dr. Ballenger, Plaintiff presented to Dr. Larry Davidson, a neurosurgeon, on November 18, 2003. Upon examination, Plaintiff's straight leg raises were positive bilaterally. Dr. Davidson diagnosed Plaintiff with severe and unstable lumbar spinal stenosis at the L4-5 level, and recommended surgery. On December 5, 2003, Dr. Davidson performed on Plaintiff a complete laminectomy of L4, followed by posterior lateral lumbar fusion of L4 to L5, using pedicle screw fixation.
29. Dr. Davidson testified that, as of March 8, 2004, Plaintiff's back pain had definitely improved from where she had been before the surgery, but she was having difficulty with her mobility and walked only with a walker. At that time, Dr. Davidson recommended that Plaintiff cease wearing her back brace and begin weaning herself from the walker. Dr. Davidson anticipated that, at the eventual conclusion of Plaintiff's medical improvement, Plaintiff would probably have a permanent partial disability rating of between twelve and fifteen percent, and that it would be unrealistic for Plaintiff to return to her prior job as a nursing assistant unless significant work demand modifications were made in regard to any significant lifting and other strenuous activities. Dr. Davidson did not release Plaintiff from his care at that time, but anticipated a return visit from her in June 2004. There is no evidence in the record that Dr. Davidson had released plaintiff to return to work at any time prior the date of the hearing before the Deputy Commissioner. *Page 13 
30. At the hearing before the Deputy Commissioner on April 1, 2004, the Deputy Commissioner noted for the record that Plaintiff was walking with the assistance of a walker and that she was wearing a back brace.
31. Beginning on June 2, 2004, Plaintiff presented to Dr. Booker Keyes, an urologist, with complaints of diurnal and nocturnal bladder frequency and bowel obstruction secondary to constipation. Dr. Keyes determined that Plaintiff was suffering from a hypoactive bladder. Following a second myelogram and consultation by Plaintiff with a neurosurgeon, Dr. Keyes diagnosed Plaintiff with a neurogenic bladder secondary to a neurological lesion on Plaintiff's lumbar spine.
32. Dr. Keyes testified that, when he first saw Plaintiff on June 2, 2004, Plaintiff was accompanied by her parents and was walking with considerable difficulty with a walker. Dr. Keyes understood from the history provided by Plaintiff and by her parents that Plaintiff was unable to care for herself at home at that time, and that she required the assistance of her parents in nearly all matters, including driving. Although Plaintiff was again accompanied by her parents during her subsequent appointments with Dr. Keyes in July and August 2004, Dr. Keyes did not know whether Plaintiff continued to require the assistance of her parents in driving, and believed that, at some point during that time, Plaintiff began walking with a cane instead of a walker.
33. Defendant has submitted a surveillance report and video footage taken of Plaintiff in July and August 2004. The surveillance shows that, during the time Plaintiff was being treated by Dr. Keyes, Plaintiff was able to drive herself to locations alone, and to walk using only a cane. *Page 14 
34. Dr. Davidson opined to a reasonable degree of medical certainty that Plaintiff's July 27, 2002, workplace accident probably aggravated or exacerbated Plaintiff's pre-existing spinal stenosis. Dr. Davidson's opinion was based in part on his understanding that Plaintiff was essentially asymptomatic prior to her work-related accident, and that her symptoms did not resolve prior to November 2003. Dr. Davidson explained that aggravation of plaintiff's stenosis might not result in objective signs such as a positive straight leg raise or diminished reflexes, but might manifest as something as straightforward as just leg pain.
35. Dr. Ballenger opined to a reasonable degree of medical certainty that Plaintiff's workplace incident of July 2002 aggravated her spinal stenosis. Dr. Ballenger's opinion was based in part on his understanding, based on Plaintiff's statements to him, that Plaintiff was not complaining of symptoms of spinal stenosis prior to the workplace accident. Dr. Ballenger explained that the spinal stenosis so apparent in Plaintiff's October 2003 myelogram may not have been apparent in Plaintiff's May 2003 MRI because Plaintiff's spinal stenosis was particularly pronounced when she was vertical, while an MRI is taken with the patient lying down.
36. Dr. Swinker opined to a reasonable degree of medical probability that Plaintiff's workplace accident of July 27, 2002, did not cause any permanent aggravation or acceleration of the degenerative condition for which Dr. Davidson performed surgery. Dr. Swinker based her opinion on the facts that Plaintiff continued working for two weeks after the injury without any modified duty; that Plaintiff's post-injury objective findings of sacral dysfunction eventually resolved; and that Plaintiff did not demonstrate any signs of neural tension or neurologic deficit during the periods of her treatment with Dr. Swinker and with Dr. Bloem. *Page 15 
37. In regard to Plaintiff's neurological condition following her July 27, 2002, workplace accident, the Full Commission gives greater weight to the expert medical opinions of Dr. Davidson, a neurosurgeon, and Dr. Ballenger, a neurologist, than to the opinion of Dr. Swinker, a doctor specializing in Occupational and Environmental Medicine and Family Medicine.
38. The Full Commission finds, in support of the opinions of Dr. Davidson and Dr. Ballenger, that any low back or leg pain experienced after Plaintiff's automobile accident of June 26, 2002, had substantially resolved by July 1, 2002; and that Plaintiff consistently complained of low back and leg pain from shortly after her July 27, 2002, workplace accident until her examinations by Dr. Ballenger and Dr. Davidson in October and November 2003.
39. The Full Commission further finds, in opposition to Dr. Swinker's opinion, that Plaintiff's ability to work full-duty immediately following her workplace accident is sufficiently explained by Plaintiff's assertion that she was taking pain medication during that time left over from her June 2002 automobile accident; and that Plaintiff's failure to show signs of neurological injury while under the care of Dr. Swinker and Dr. Bloem has been adequately explained by Dr. Davidson's testimony that such signs would not necessarily be present following a permanent aggravation of Plaintiff's spinal stenosis. 40. The Full Commission finds credible Plaintiff's testimony that she suffered continuous low back and leg pain from shortly after her July 27, 2002, workplace accident through the dates of her diagnosis with severe spinal stenosis by Dr. Ballenger and Dr. Davidson in October and November 2003. The Full Commission finds that any symptom magnification exhibited by Plaintiff during that period was merely an exaggeration by Plaintiff of those *Page 16 
already-present underlying pain symptoms as a response to Plaintiff's apparent conviction that Defendant's agents did not believe that Plaintiff was actually experiencing pain.
41. Dr. Keyes has opined to a reasonable degree of urological certainty that the neurological lesion causing Plaintiff's June 2004 bladder and bowel difficulties was due either to Plaintiff's July 27, 2002, workplace injury or to the December 2003 spinal surgery arising out of that injury, or to some combination of the two. However, Dr. Keyes was unable to separate out how much of Plaintiff's bladder and bowel conditions might be related to one or the other.
42. The Full Commission finds, based on the greater weight of the evidence, including medical records from treating physicians and the opinions expressed by those physicians either through their notes or through deposition, that the severe spinal stenosis for which Dr. Davidson provided surgery in December 2003 was a progressive degenerative condition that was permanently aggravated or exacerbated by Plaintiff's July 27, 2002, workplace accident. The Full Commission further finds that the bladder and bowel conditions for which Plaintiff received treatment from Dr. Keyes were caused by Plaintiff's July 27, 2002, workplace accident, either as a direct result of the July 2002 aggravation of Plaintiff's spinal stenosis or as a consequence of the December 2003 surgery to treat that spinal stenosis.
43. The Full Commission further finds, based on the greater weight of the evidence, that Plaintiff was temporarily totally disabled from the time she was taken out of work by Dr. Ballenger on October 30, 2003, and continuing beyond the date of hearing before the Deputy Commissioner, at which time Plaintiff was still under the care of Dr. Davidson. It does not appear from the evidence of record that either Dr. Davidson or Dr. Ballenger has released Plaintiff to return to any type of employment. *Page 17 
44. The Form 22 stipulated to by the parties before the Industrial Commission shows that Plaintiff earned $16,661.15 during the 42 weeks and 6 days between October 1, 2001, and Plaintiff's workplace injury of July 27, 2002. Based on that Form 22, the Full Commission finds that Plaintiff's average weekly wage at the time of her workplace injury by accident was $388.76, yielding a compensation rate of $259.17 per week.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury by accident arising out of and in the course of her employment on July 27, 2002. N.C. Gen. Stat. § 97-2(6).
2. The greater weight of the evidence of record establishes a causal relationship between the work-related accident on July 27, 2002, and the back condition for which plaintiff received surgery on December 5, 2003, and also Plaintiff's subsequent bladder and bowel difficulties. N.C. Gen. Stat. § 97-2(6); Holley v. ACTS, Inc., 357 N.C. 228, 581 S.E.2d 750
(2003).
3. Plaintiff is entitled to payment of medical expenses incurred as a result of the compensable injury by accident as may have reasonably been required or be required in the future to effect a cure, provide relief, or lessen the period of plaintiff's disability, including the medical care provided by Dr. Ballenger, Dr. Davidson, and Dr. Keyes. N.C. Gen. Stat. §§ 97-2(19), 97-25.
4. Because the record of evidence shows that Plaintiff was taken out of work by Dr. Ballenger prior to her surgery by Dr. Davidson, and because there is no evidence of record that *Page 18 
Plaintiff was subsequently released to return to work by Dr. Davidson as of the date of the hearing before the Deputy Commissioner, Plaintiff has produced "medical evidence that [she] is physically or mentally, as a consequence of the work related injury, incapable of work in any employment," Russell v. Lowes Product Distribution, 108 N.C. App. 762,765, 425 S.E.2d 454, 457 (1993). Plaintiff is accordingly entitled to compensation at the rate of $259.17 per week from October 30, 2003, until the date of the hearing before the Deputy Commissioner and continuing thereafter for the temporary total disability Plaintiff has sustained as a result of her injury by accident. N.C. Gen. Stat. §§97-2(5), 97-29.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following
 AWARD
1. Subject to the attorney's fee approved below, Defendant shall pay compensation to Plaintiff for the temporary total disability suffered by Plaintiff at the rate of $259.17 per week from October 30, 2003, to the present and continuing until Plaintiff returns to work or until further order of the Industrial Commission. That compensation which has accrued shall be paid in a lump sum directly to Plaintiff, subject to the attorney's fee herein approved.
2. Defendants shall pay for medical expenses incurred as a result of the compensable injury by accident as may have reasonably been required or be required in the future to effect a cure, provide relief, or lessen the period of Plaintiff's disability, including the medical care provided by Dr. Ballenger, Dr. Davidson, and Dr. Keyes. 3. An attorney's fee in the amount of twenty five percent (25%) of the compensation awarded herein is hereby approved for Plaintiff's counsel, which shall be deducted from the *Page 19 
aforesaid Award and paid directly to counsel for Plaintiff. Of the continuing amount, Defendant shall send every fourth compensation check directly to Plaintiff's attorney.
4. Defendant shall pay the costs.
This the ___ day of September, 2007.
 S/______________________
 BERNADINE S. BALLANCE
 COMMISSIONER
CONCURRING:
S/______________________ PAMELA T. YOUNG
CHAIR
S/______________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1